**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**Ronald Blackburn,**
**Plaintiff Below, Petitioner**

**vs.)  No. 20-0251** (Mingo County 18-C-71)

**Norfolk Southern Railway Company,**
**Defendant Below, Respondent**

**MEMORANDUM DECISION**

Petitioner Ronald Blackburn, by counsel Benjamin P. Tobin, appeals the February 26, 2020, order of the Circuit Court of Mingo County granting summary judgment in favor of respondent. Respondent Norfolk Southern Railway Company, by counsel Angela W. Konrad, J.H. Mahaney, and William C. Brown III, filed a response in support of the circuit court's order. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

In June of 2018, petitioner filed a complaint against respondent alleging that an injury he experienced during the course of his employment with respondent on May 18, 2016, was caused by "the carelessness and negligence of" respondent. Petitioner alleged that respondent violated the Federal Employers' Liability Act, 45 U.S.C. §§ 51-60 ("FELA"),[1] by

---

[1] Under FELA,

Every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, or between the District of Columbia and any of the States or Territories, or between the District of Columbia or any of the States or Territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury . . . death resulting in whole or in part from the negligence of any of the officers, agents, or employees

(continued . . .)

1

a.   Fail[ing] to provide safe and suitable tools and equipment to perform the task assigned; and/or

b.   Fail[ing] to furnish [petitioner] with reasonably necessary and proper equipment with which to perform his assigned duties; and/or

c.   Fail[ing] to warn [petitioner] of reasonably foreseeable hazardous conditions existing with [respondent's] equipment; and/or

d.   Allow[ing] unsafe practices to become the standard practice; and/or

e.   [] [A]ssigning [petitioner] work which [respondent] knew or, in the exercise of reasonable care, should have know[n] would result in injury to [petitioner]; and/or

f.   Fail[ing] to provide [a] reasonably safe place to work; and/or

g.   Fail[ing] to provide reasonably safe methods of work.

Petitioner sought $4,000,000 in damages. Respondent filed an answer denying liability.

During discovery, petitioner took no depositions, and respondent deposed petitioner. Petitioner's testimony established the circumstances of his employment with respondent and his injury.

According to his deposition testimony, petitioner was hired by respondent in 2007 as a carman in Williamson, West Virginia.[2] After a period in which petitioner was furloughed, he began working as an electrician for respondent in 2010. At that time, petitioner completed a two-month training program in Georgia where he learned how to troubleshoot and work on electrical problems with locomotives. Upon his return to West Virginia, petitioner was assigned to work with a senior electrician with whom he completed a two-year apprenticeship, receiving on-the-job training. Because electricians employed by respondent were required to perform tasks other than electrical work, petitioner also received on-the-job training to work as a laborer, machinist, pipefitter, and welder. According to petitioner, at the conclusion of his apprenticeship, he felt qualified to perform the tasks required of him as an electrician working for respondent.

In 2016, petitioner's primary responsibility was to respond to issues with and service locomotives. Servicing locomotives included "toilet dumping;" resupplying water, ice, fuses, hoses, and tools; taking oil samples; and sanding. "Sanding" a locomotive is the process by which the sand reservoirs on the locomotive are replenished. During operation of a locomotive, sand can

---

of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51. FELA claims are subject to a three-year statute of limitations. *See* 45 U.S.C. § 56.

[2] In the course of his employment as a carman, petitioner was trained to "remove the trucks out from underneath the cars," "change[] wheels," and complete "repair work on bodies of the cars, cutting, welding."

be released to improve traction between the locomotive and the track.

To sand a locomotive, petitioner would move the locomotive to a service track near large sand tanks adjacent to the service track. Petitioner would "spot" or park locomotives in a particular location near the sand tanks while looking through a side window of the locomotive. Another electrician showed petitioner how to spot a locomotive by looking through the side window of the locomotive. Per instructions from supervisors, once locomotives were spotted, they should not be repositioned.[3] According to petitioner, although some employees were not careful about where they spotted the locomotives on the service track, petitioner claimed he "put it in the same place every time." He testified that, despite his ability to precisely and consistently spot locomotives in the correct location, he suggested to a supervisor that respondent "put a flag out here" that would hit the locomotive's window when the locomotive was properly positioned; however, no such system was ever installed.

Once a locomotive was properly spotted on the service track next to the sand tanks, the locomotive could be sanded using a rod-like device called a sand wand. The sand wand is a four-foot-long device made of heavy, stout aluminum that is placed into the sand hole of a locomotive to refill the locomotive's sand reservoirs. Sand passes from a sand tank, through a ten-foot-long hose attached to the sand wand, through the sand wand, through the sand hole, and into the sand reservoirs on the locomotive. When not in use, the sand wand is attached to an overhead trolley-like apparatus made up of a holding rack and rail that runs beside the sand tank. The rail allows the hose to slide "a couple feet left or right" during sanding. Petitioner sanded at least two locomotives per shift in the last four years he worked for respondent.

Other employees had suggested to a supervisor that the sand tanks be repositioned so that the employees would not need to be as precise when spotting locomotives; however, no changes were made to the location of the sand tanks. Petitioner believed that repositioning the tanks would also make sanding the locomotives less "dangerous." In describing the sanding process, he testified:

> But you're still putting yourself in danger when you're out on the edge of this [locomotive] and you've got a – you've got a set of steps coming up to your rail. You got a railing that you're leaning out against and – with the steps, and usually you'll have to come right out to the edge of the steps and reach as far as you can reach to get either [sand wand] – either east or west.

Petitioner believed that sanding the trains was dangerous "because you have to stretch" to reach the sand wands; however, petitioner did not know of any other person who had been injured while using a sand wand at his place of employment in Williamson.

On May 13, 2016, petitioner was informed that he would be furloughed at the close of business on May 20, 2016. Five days after receiving the notice, petitioner was injured while sanding a locomotive. On May 18, 2016, he and another employee were instructed to service two

---

[3] Petitioner understood that the reason locomotives were not supposed to be repositioned after being spotted was to decrease the total time needed to service the locomotives.

locomotives. Petitioner spotted the locomotives on the service track adjacent to the first of four sand tanks. After spotting the locomotives where he intended to spot them, petitioner walked out to the locomotive walkway, placing his left foot on the walkway, his right foot on the first step directly below the walkway, and his left hand on the handrail leading up to the locomotive steps. Petitioner, who is five feet and eight inches tall, reached out with his right hand to grasp the sand wand, "stretch[ing] so far out to get this wand." The sand wand was located about "as far as [he] could stretch to the east." He lifted it approximately eight to ten inches to remove it from the holding rack. While holding the sand wand, petitioner made a "twist move" back toward the locomotive, bringing the sand wand toward the locomotive and placing it in the sand hole. Midway through this "twist move," petitioner experienced a burning sensation in the center of his back, below his belt line and right above his tailbone. Petitioner continued to attempt to perform his duties by taking oil samples, but the pain in his back quickly became excruciating. He reported the incident to a supervisor and was transported to a hospital for treatment. In a personal injury report later completed by petitioner, he wrote: "I was taking sand wand off the holding rail, and I had to reach out to get wand, and while I was lifting wand and turning I felt a sharp pain in my lower back." Prior to this injury, petitioner had never been injured while using a sand wand.

After the close of discovery, respondent filed a motion for summary judgment, arguing that petitioner's testimony failed to establish a question of fact that would permit the case to proceed to a jury. More specifically, respondent argued that petitioner had failed to present evidence of negligence on the part of respondent or that petitioner's injury was due to unsafe working conditions. Respondent also argued that petitioner's own "twist move" caused or contributed to his injury and that petitioner was in violation of Rule 1170 of respondent's safety and general conduct rules which provides, in part: "When lifting or moving heavy or cumbersome objects, avoid jerking, sudden movements or twisted positions."

Petitioner argued that his testimony was sufficient to establish a question of fact for a jury to decide and that FELA has a relaxed standard of proof regarding negligence, requiring only that respondent be "slightly negligent" in order for petitioner to prevail on his claim.

Following a hearing on the motion, the circuit court entered a final order on February 26, 2020, granting respondent's motion for summary judgment. The circuit court found that petitioner "merely felt pain in his back when he engaged in improper body mechanics and twisted his body while performing ordinary duties that he had performed on numerous prior occasions while he was at work." The court further found that "there is no evidence of unsafe work conditions or unsafe tools . . . [, and] [t]here is no evidence that either the sand wand or the procedure used by [petitioner] to sand the locomotive on May 18, 2016, were unsafe." Based on these findings, the circuit court concluded that petitioner's FELA claim should be dismissed because petitioner had produced no evidence of negligence on the part of respondent, and petitioner had produced no evidence that petitioner's injury resulted from unsafe working conditions. The circuit court determined that it was petitioner's "own 'twist move' . . . that caused or contributed to his pain and alleged injury" and that petitioner admitted this "twist move" was a violation of Rule 1170. The circuit court concluded that "there is ample evidence from [petitioner]'s own testimony to support a finding that [petitioner] was solely negligent."

With regard to the standard of proof required by FELA, the circuit court concluded,

4

"Contrary to [petitioner]'s assertions, the FELA does not create a liability standard so absolute that it ensures every paper-thin, speculative claim asserted is impervious to summary judgment." Relying on *Gardner v. CSX Transportation, Inc.*, 201 W. Va. 490, 498 S.E.2d 473 (1997), the circuit court found that the common law principles of negligence "guide the proper application of the FELA." Quoting Syllabus Point 6 of *Gardner*, the circuit court's order stated, "To prevail on a claim under the [FELA], a plaintiff employee must establish that the defendant employer acted negligently and that such negligence contributed proximately, in whole or in part, to plaintiff's injury." The circuit court disagreed with petitioner's contention that a more lenient standard applied to his FELA case under *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 77 S. Ct. 443 (1957), and *CSX Transportation, Inc. v. McBride*, 564 U.S. 685, 131 S. Ct. 2630 (2011). The circuit court found that neither *Rogers* nor *McBride* relaxed the standard of evidence or imposed a lower standard of proof than the common law.

Petitioner now appeals the circuit court's summary judgment order to this Court. In his sole assignment of error, petitioner argues that genuine issues of fact exist as to whether respondent was negligent in its breach of its duties and the standards of care it owed petitioner, precluding summary judgment. Our standard of review in this instance is de novo. *See* Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994) ("A circuit court's entry of summary judgment is reviewed *de novo*.").

Upon our review, we find that this case is comparable to *Gardner*. In that case, appellant William Gardner, a road brakeman employed by CSX Transportation, Inc. ("CSX"), was injured when the locomotive in which he was riding struck a vehicle that had stalled on the railroad tracks. *See Gardner*, 201 W. Va. at 493, 498 S.E.2d at 476. "According to appellant, upon impact, his body was thrust into the seat back, his back hitting a horizontal metal hinge which connected the back and seat of the chair." *Id.* at 494, 498 S.E.2d at 477. Following the collision, appellant developed back pain and was unable to work for several months. *See id.* at 493, 498 S.E.2d at 476. Appellant filed a lawsuit against CSX, alleging CSX violated FELA "by failing to install a cab seat without a metal hinge." *Id.* "Appellant introduced medical testimony that the impact of appellant's back with the metal hinge was a contributing factor to appellant's injury." *Id.* at 494, 498 S.E.2d at 477.

Appellant's FELA claim against CSX proceeded to trial. *See id.* Appellant testified that, before the accident, no problems had been reported with the locomotive's equipment or the cab seat. *See id.* He further testified that he was unaware of anyone having ever made a complaint about the safety of the cab seat and that the cab seat did not malfunction when the locomotive struck the stalled vehicle. *See id.* Following the presentation of appellant's evidence, CSX made a motion for a directed verdict, arguing that appellant had "failed to establish, *prima facie*, that CSX was negligent with regard to the existence of the metal hinge on the cab seat and further, that CSX could not reasonably foresee appellant's injury, as required under the FELA." *Id.* at 495, 498 S.E.2d at 478. The trial court granted the motion, and appellant appealed that decision to this Court. *See id.* Appellant argued that the jury should have determined whether CSX's negligence caused his injury and that he had produced "competent evidence" demonstrating that CSX's negligence caused his injury. *Id.* at 501, 498 S.E.2d at 484.

On appeal, the Court observed that "the test for a trial court to determine a jury question . . . 'is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.'" *Id.* at 499, 498 S.E.2d at 482 (quoting *Rogers*, 352 U.S. at 506-07, 77 S.Ct. at 448-49); *see also* Syl. Pt. 3, *Crookham v. New York Central Railroad Company*, 144 W. Va. 196, 107 S.E.2d 516 (1959) ("In an action prosecuted under the [FELA], to entitle plaintiff to recover the proof must justify with reason that the injury complained of resulted, in whole or in part, from negligence of defendant which contributed proximately to the cause of the injury."). The Court was careful to note that while "FELA is to be liberally construed[,] . . . it is [not] a worker's compensation statute. . . . The basis of [the employer's] liability is his negligence, not the fact that injuries occur." *Gardner*, 201 W. Va. at 500, 498 S.E.2d at 483 (quoting *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 543, 114 S. Ct. 2396, 2404 (1994)) (emphasis omitted). The Court recognized that the "lenient standard for avoiding summary judgment under the FELA . . . has its limits. The plaintiff must still present *some* evidence of negligence." *Id.* (quoting *McGinn v. Burlington Northern Railroad Co.*, 102 F.3d 295, 300 (7th Cir. 1996)). Accordingly, the Court held, "To prevail on a claim under [FELA], 45 U.S.C. § 51 (1939), a plaintiff employee must establish that the defendant employer acted negligently and that such negligence contributed proximately, in whole or in part, to plaintiff's injury." *Id.* at 492, 489 S.E.2d at 475, Syl. Pt. 6.

In *Gardner*, the Court concluded that appellant was not entitled to relief. The Court said, "appellant introduced no evidence that, in providing a cab seat with a metal hinge, CSX breached its duty of care to appellant and thus, acted negligently." *Id.* at 501, 498 S.E.2d at 484.

Like appellant in *Gardner*, petitioner has failed to produce any evidence that respondent breached its duty of care to petitioner. Petitioner produced no evidence that problems had been reported with the sanding equipment prior to his injury or that the locomotive or sanding equipment were malfunctioning when he was injured. Further, petitioner did not produce evidence demonstrating that his training, the means by which he spotted locomotives, and the means by which he was instructed to sand locomotives—including reaching or stretching to grasp a sand wand—constituted a breach of respondent's duty of care to petitioner.[4] Consequently, upon our de novo review, we conclude that petitioner did not show that respondent acted negligently and that the circuit court properly granted respondent's motion for summary judgment.[5]

For the foregoing reasons, we affirm.

---

[4] We note that while petitioner testified that a person sanding locomotives would "usually . . . reach as far as you can reach to get either [sand wand]," and while petitioner claimed that, on the date of his injury, he "stretch[ed] so far out to get this wand" and that the sand wand was located about "as far as [he] could stretch to the east," petitioner did *not* testify, as he represented in his brief, that he "had to overextend his body" to grasp or manipulate the sand wand on the date of his injury.

[5] Petitioner argued in his brief that the circuit court erred by failing to apply a relaxed standard of proof to his negligence claim. Because our law is clear that petitioner was required to produce *some* evidence of negligence to prevail on his claim and he failed to produce any such evidence, we decline to address petitioner's contention concerning the standard of proof.

Affirmed.

**ISSUED:** September 27, 2021

**CONCURRED IN BY:**

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton